## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**SARAH SOLLBERGER**                                    CIVIL ACTION

**VERSUS**                                              NO. 23-1023

**VICTORIA HUMPHRIES**                                  SECTION "O"


## <u>ORDER TO SHOW CAUSE REGARDING JURISDICTION</u>

During his life, the late Robert Hampton Sollberger ("Bob") ostensibly donated to Victoria Humphries ("Victoria")—Bob's then-recently deceased son's, Samuel's ("Sam's") fiancée and the mother of Bob's then-unborn grandchild—the property at 1101 West Hall Avenue in Slidell, where Victoria and Sam had lived together with Bob's blessing in the years leading up to Sam's untimely death. This donation *inter vivos* purportedly was effected and accepted by Victoria in a written instrument signed before a notary (Kenneth S. Moran of Pelican Title, LLC) and two witnesses (Natalie R. Witman—Victoria's mother—and Holly Maestri).[1] Before the Court in this litigation in which Bob's daughter, Sarah Sollberger ("Sarah"), seeks to nullify her father's donation on three grounds as well as to recover damages for alleged tortious conduct are three motions to dismiss Sarah's second amended complaint[2]: one motion[3] by Victoria Humphries, a second[4] by Natalie Witman, and a third[5] by Holly

---

[1] *See* Ex. A to ECF No. 1 and ECF No. 2-1.
[2] ECF No. 37.
[3] ECF No. 46.
[4] ECF No. 49.
[5] ECF No. 50.

Maestri, Kenneth Moran, and Pelican Title, LLC. For the following reasons, the motions shall be **DENIED WITHOUT PREJUDICE**, and all parties are ordered to show cause as to why this litigation should not be dismissed without prejudice for lack of subject matter jurisdiction. As set forth more fully below, the parties are ordered to submit memoranda addressing whether this Court has diversity jurisdiction or whether the probate exception applies; whether Sarah's claims are justiciable (including but not limited to whether she has Article III standing to pursue each claim) and/or whether she as the administrator of her father's succession is the real party in interest; and whether the *Rooker-Feldman* doctrine applies. Following submission of memoranda by the parties addressing these issues set forth more fully below, Plaintiff may be granted leave to amend defective jurisdictional allegations as to Pelican Title LLC, if she can in good faith do so. As to any claims which survive jurisdictional scrutiny, Defendants may present Rule 12 dismissal grounds to any newly operative complaint.

## I.    BACKGROUND

This family saga arises from a dispute between the plaintiff and her deceased brother's girlfriend concerning the plaintiff's father's donation *inter vivos* of a house in Slidell, Louisiana to the plaintiff's brother's girlfriend, where the latter had lived with her boyfriend before his untimely death.

Plaintiff Sarah Sollberger seeks to nullify (or seeks declaration(s) of nullity of) a donation *inter vivos* that purported to transfer immovable property from Bob, Sarah's now-deceased father, to Victoria, the former live-in girlfriend/fiancé of

Sarah's brother, Samuel Sollberger, who died in the year before Bob died. Sarah claims that Victoria schemed or was influenced by others to participate in a scheme to enrich herself by exploiting Bob, by forging or causing someone to forge his name on, or otherwise by "pressur[ing him in[to] sign[ing]"[6] a document purportedly donating to Victoria the house (owned outright by Bob) where Victoria lived with Sam in the years before Sam died.

Though she nowhere expressly requests that the Court declare null the donation *inter vivos*, Sarah's operative complaint presents three "nullity of alleged donation *inter vivos*" causes of action on the grounds of fraud, undue influence, and improper form; two causes of action purportedly to recover damages for tortious conduct; one cause of action for intentional infliction of emotional distress "through elder abuse"; and a final cause of action for conversion.

*The Family Dynamics*

According to the operative complaint, Bob Sollberger and Elizabeth Stahler had two children, Sarah and Sam.[7] Bob lived in Slidell, Louisiana, near Sam.[8] Bob's ex-wife, Ms. Stahler, and their daughter, Sarah, live in Mississippi.[9] In and before July 2022, Sam lived with his girlfriend/fiancé of several years, Victoria, at 1101 West Hall Avenue in a house owned outright by Bob; Sam occasionally paid rent to his father.[10]

---

[6] ECF No. 37 ¶ 39.
[7] *Id.* ¶¶ 9, 27.
[8] *Id.* ¶ 14.
[9] *Id.* ¶¶ 1, 9, 26.
[10] *Id.* ¶¶ 10-12.

*Sam's Death*

On July 21, 2022, while working on a job in Mississippi, Sam was electrocuted and died intestate.[11] At that time, he was living with Victoria, who was pregnant. Sarah and her mother "handl[ed] Sam's affairs and put[] together his funeral service" which took place the following week.[12] Instead of assisting in the service's planning,[13] it is alleged that "Victoria and her family were putting into action a concerted plan to exploit and abuse Bob Sollberger and steal the residence at 1101 West Hall."[14] It is further alleged:

> Victoria, or someone in Victoria's family or support group, panicked and decided they would exploit Bob Sollberger's vulnerabilities and trick him into signing various papers so they could transfer the home into their family and take control of Bob Sollberger's affairs. They, with the assistance of others, embarked on a plan to try and not end up as the ones financially responsible for Victoria and her unborn child. This plan involved several components including exploiting Bob Sollberger's diminished capacity to help them secure title to the property on West Hall. They employed lawyers, notaries, and even title companies in the process and aggressively tried to not only gain title to the house, but to completely take over Bob Sollberger's affairs.[15]

It is repeatedly alleged that "Victoria and her accomplices [pursued] a very aggressive attempt to steal [Bob's] property."[16] They allegedly did so by telling Bob—who was allegedly "distraught" and "lacked meaningful cognitive function"—he was signing "health care related" documents but instead included a general power of attorney that

---

[11] *Id.* ¶¶ 10, 27.

[12] *Id.* ¶¶ 12, 15.

[13] *But see id.* 15 (alleging that Victoria and her mother, Natalie Witman, organized the transfer of Sam's body from Mississippi to Louisiana, where he would be buried).

[14] *Id.*

[15] *Id.* ¶ 16.

[16] *Id.* ¶ 17.

4

allowed Victoria to control his affairs.[17] It is further alleged that only after Sam died

did Victoria begin "telling people she was Sam's fiancé."[18]

*The Inter Vivos Donation*

Victoria's alleged scheme "to steal the home and take over Bob's affairs

culminated on July 26, 2022, the day before Sam's funeral."[19]  On that day, Bob

donated to Victoria the property at 1101 West Hall Avenue, which was the house

where Victoria and Sam had lived together. This donation *inter vivos* purportedly was

effected and accepted by Victoria in a written instrument signed by them both before

a notary (Kenneth S. Moran of Pelican Title, LLC) and two witnesses (Natalie R.

Witman and Holly Maestri).[20]

Sarah alleges "upon information and belief":

[T]hey transported Bob in Victoria's mother's vehicle on a round trip of
over 50 miles to Pelican Title, LLC located in Mandeville, Louisiana,
past several local notaries. Bob was not read the contents of the
documents he signed nor did he read them on his own. He trusted these
people (at least Victoria) and was fearful of the others. The witnesses to
the document were anything but disinterested persons. One of the
witnesses was Natalie R. Witman, Victoria's mother. Mom securing the
home for her pregnant daughter, and unfettered access to his bank
accounts and personal assets, is hardly a disinterested witness.
Somehow, the conspirators concluded that Bob Sollberger did not need
any copies of the documents he had allegedly signed. Victoria and her
accomplices purposefully deceived Bob by suggesting to him the
documents he was signing had to do with health care matters
exclusively. For all Bob knew, the documents merely allowed Victoria to

---

[17] *Id.* ¶¶ 17-18.
[18] *Id.* ¶ 18 (further alleging "[i]magine preparing for your brother's funeral, and consoling your
parents, while his girlfriend schemes to take over your father's affairs and transfer a significant
portion of your father's limited assets to herself").
[19] *Id.* ¶ 19.
[20] *See* Ex. A to ECF No. 1.

take him to the doctor if Sarah was unavailable or too far away when Bob needed medical attention.[21]

Sarah alleges that when Victoria and her mother "found Bob that day, he was distraught over his son's death, inebriated, and had no eyeglasses with him."[22] Sarah alleges that her father "could not read or understand the document due to his duress, poor vision, and various well documented [but unspecified] health reasons."[23] Sarah further alleges that Victoria "and her accomplices had someone draw up a donation *inter vivos* document that purported to transfer the home on West Hall Avenue to Victoria, revoked Sarah's long running power of attorney, and named Victoria as the one in charge of Bob's affairs!"[24]

It was allegedly on this date that "Victoria and her co-conspirators pressured and tricked Bob into signing a series of documents that transferred the house to Victoria[.]"[25] In addition to alleging that Bob was "tricked into signing" documents,[26] Sarah also alleges that Bob did not sign the Donation *Inter Vivos*, alleging that Victoria may have signed Bob's name "thinking it was allowed" or someone else may have done it.[27] Sarah also alleges outright forgery.[28]

As Sarah sees it:

---

[21] ECF No. 37 ¶ 24.
[22] ECF No. 37 ¶ 23.
[23] *Id.* ¶ 20.
[24] *Id.* ¶ 21.
[25] *Id.* ¶ 19.
[26] *Id.* ¶¶ 19, 31.
[27] *Id.* ¶ 20.
[28] *Id.* ¶ 19. Though Sarah purports to attach as Exhibit A the "Report of Expert Document Examiner Curt Baggett" in fact there is no such exhibit filed with the second amended complaint. *Compare* Paragraph 19 of ECF No. 37 *with* ECF No. 37 as docketed on ECF. Sarah also references in her second amended complaint an Exhibit B (*see* ECF No. 37 p.8 n.3) but no such exhibit was filed.

Bob likely would have been willing to allow Victoria to use the home until the baby was born and may have even considered giving her half of his interest in the home on West Hall Avenue. Despite his generosity, this was not enough for Victoria, and her accomplices, who had prepared documents that: 1) transferred all of his interest in the home to Victoria; 2) revoked his daughter's power of attorney; and 3) placed Victoria as his agent over all of his affairs, including his financial and medical affairs. The audacity and cold heartedness of this plan was sickening and beyond the pale.[29]

*Sam's Funeral*

Immediately following Sam's funeral, "family and close friends went to Elizabeth Stahler's home."[30] More specifically, Sarah alleges:

Victoria and her mother showed up [at Ms. Stahler's home where family and friends had gathered] to get pictures that had been paid for by Sarah[.] Victoria even swam in the pool. They did not do what any decent person would do had they just been gifted a house. They did not mention it at all. They did not say they were grateful. They did not thank anyone. They simply got more free stuff (pictures) and continued to try and fleece the family for as much as they could possibly get their hands on.[31]

Sarah also alleges that she later discovered that "*during Sam's funeral*, the fraudulently secured donation *inter vivos* had been filed at the courthouse."[32]

*After Sam's Funeral*

The day after Sam's funeral on July 28, 2022, Sarah and her mother continued to handle administrative issues associated with Sam's death.[33] When they stopped by Bob's house in Slidell, one of Bob's relatives told Sarah that she was "in for a big surprise" because "Victoria and her family had caused Bob to sign several

---

[29] *Id.* ¶ 25.
[30] *Id.* ¶ 26.
[31] *Id.*
[32] *Id.* ¶ 32 (emphasis in original).
[33] *Id.* ¶ 27.

documents."[34] When Sarah asked Bob what documents he signed, he said he did not know, that he did not read them because he did not have his glasses, but that "it was something about his healthcare."[35] Then Bob said he was going to let Victoria stay in the house until she had the baby.[36]

When Sarah and her mother stopped by the West Hall house to retrieve Sam's social security card, they were unable to enter the "secured" house.[37]

"Eventually," though it is not indicated which day or even month, "Sarah's mother had a friend search the courthouse records and learned that all of Bob's ownership interest in the property had been purportedly donated *inter vivos* to Victoria[.]"[38] Bob's signature allegedly "looked more like Victoria's handwriting."[39] It is alleged that "they" (presumably Sarah and her mother) went to Bob's house to discuss the matter with him.[40] "Bob did not understand, he was upset."[41] It is alleged that Bob did not have copies of the documents and that he expressed fear that Victoria or her grandfather would try to poison or shoot him.[42] Sarah alleges that her father's fear "horrif[ied]" her and that "[l]osing your brother and then having someone try and steal your place as your father's daughter, was traumatic."[43]

---

[34] *Id.* ¶ 28.
[35] *Id.*
[36] *Id.*
[37] *Id.* ¶ 29.
[38] *Id.* ¶ 30.
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*

"[T]hen," though it is not alleged when, "Sarah and Elizabeth . . . returned to Sam's house and found Victoria's grandfather loading . . . Sam's tools into his truck and changing the locks on the door."[44] Victoria's grandfather directed them to speak to Victoria, who "smiling and smirking . . . told them to leave, then chuckled, and said they were no longer welcome there."[45] Victoria's grandmother allegedly filmed Sarah and Elizabeth and "pretend[ed] Victoria was in danger [and tried] to orchestrate a reason to claim [Victoria and her grandmother] were under duress."[46] "After cross words and general theatrics, Sarah and Elizabeth left."[47] When they went to Bob's house and told him what happened, "he realized that Victoria had tricked him into signing documents that disposed him and the family of significant rights."[48] Sarah further alleges that her father "was very angry and scared."[49]

"[L]ater," though it is not alleged when, Sarah "received an email from Steven Witman that stated that her power of attorney had been revoked."[50] Sarah alleges:

> Upon checking court records, they realized that during Sam's funeral, the fraudulently secured donation *inter vivos* had been filed at the courthouse. Sarah filed an elder abuse report and spoke with her father about the efforts to take his property and take over his affairs. He was livid. Victoria filed police reports alleging battery by Sarah's mother against her and sought TROs alleging Sarah's mother was a menace to society and several other false accusations. Victoria frantically tried to call Bob [] repeatedly, but he refused to pick up until he got sick of the calls and picked up the phone to yell, "I'm not talking to you b**ch!"[51]

---

[44] *Id.* ¶ 31.
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.* ¶ 32.
[51] *Id.*

Sarah indicates that she believes Victoria and/or someone else "showed a horrible lapse in judgment, ethics, and basic morality" in "procur[ing] through fraud" the donation *inter vivos* rather than allowing "good and kind people"—Sarah, her mother, and her father—"to make sure [Victoria] was taken care of going forward."[52] Sarah further alleges that "Victoria [] was in a position of trust in [Bob's] life when she decided to go along with a plan to exploit him. He was relying on her as the connection to his son who had died suddenly[.] Victoria and her accomplices pounced. Once the theft of the house was complete, Victoria and her family never lifted a single finger for Bob."[53]

*Bob's Last Will and Testament*

On August 8, 2022—two weeks after the donation *inter vivos* was executed—Bob executed his last will and testament.[54] The will states that Bob "give[s] and bequeath[s] all the property of which I die possessed . . . to my daughter" and it names Sarah as Executrix of his estate.[55]

---

[52] *Id.* ¶ 33.

[53] *Id.* ¶ 34.

[54] *See, e.g.,* ECF No. 46-2 (certified copy of the state-court succession proceeding, *The Succession of Robert Hampton Sollberger* from inception of case until January 17, 2024); ECF No. 49-3. Along with their motions to dismiss, Defendants submitted the record of Bob's succession proceeding. Though Sarah purports to take issue with their consideration, she does not dispute these filings or their accuracy. Even though Sarah does not advance allegations specifically regarding her father's will in the operative complaint, the Court has discretion to take judicial notice of this document filed into the state public record and/or that Sarah filed Bob's last will and testament into his succession proceeding. *See* Fed. R. Evid. 201. Sarah alleges that she is the sole heir to (and administrator of) Bob's estate.

[55] ECF No. 46-2.

*The Instant Lawsuit*

In March 2023, Sarah sued Victoria. The case was assigned to another section of this Court. In her initial complaint, filed the month before her father died, Sarah alleges that she is "the sole heir" to Bob's estate and is the administrator of her brother's estate.[56] Though at the time Bob was still living, Sarah filed the lawsuit on behalf of herself personally.

*Bob's Death*

On April 9, 2023, Bob died.[57] It is *not* alleged that during his lifetime Bob himself took any action to nullify the donation *inter vivos*.

*After Bob's Death: The Succession Proceeding*

On September 21, 2023, Sarah filed a Petition to Probate Last Will and Testament, Waiver of Administration, and for Possession in the 22nd Judicial District Court for the Parish of St. Tammany, *Succession of Robert Hampton Sollberger*, No. 2023-31066.[58] In her petition, Sarah filed Bob's Last Will and Testament (which "bequeath[ed] all the property of which I die possessed" to Sarah) and petitioned the state court to dispense with administration of her father's estate, seeking to be placed in possession of her father's entire estate.[59] In support of her petition, she filed a sworn Detailed Descriptive List of Assets and Liabilities, purporting to itemize "all known assets comprising the estate" of her father.[60] Though two parcels of immovable

---

[56] ECF No. 1 ¶1; ECF No. 37 ¶1.
[57] ECF No. 37 ¶ 35.
[58] *See, e.g.,* ECF No. 46-2.
[59] *See id.*
[60] *Id.*

11

property were included on the sworn list, absent from the list is the property she seeks to recover in this litigation, 1101 West Hall Avenue, Slidell, Louisiana 70433. Likewise, in the proposed draft Judgment of Possession, Sarah sought an order sending her "into possession of all of the property comprising the estate of the decedent, which said property includes, but is not limited to, the following" which lists only those two parcels of immovable property included on the sworn list.[61] Again absent from the judgment of possession is the property that is the subject of the instant litigation.

On October 18, 2023, the state court issued the following order on Sarah's Petition:

> IT IS ORDERED that the Last Will and Testament of Robert Hampton Sollberger, dated August 8, 2022, shall be and is hereby probated, filed and executed, all in accordance with Louisiana law and jurisprudence;
> IT IS FURTHER ORDERED that pursuant to the attestations and waiver of administration by petitioner, the Testamentary Executrix, given that the decedent's estate is relatively free of debt, said administration of decedent's estate shall be and is hereby dispensed with, according to law; and
> IT IS FURTHER ORDERED that Sarah Elizabeth Sollberger, the universal legatee and sole testamentary heir of the property in the decedent's estate, shall be and is hereby put into possession of the entire estate of decedent in accordance with the terms of the Last Will and Testament, and pursuant to the Judgment of Possession, both of which are attached hereto.[62]

Expressly "[c]onsidering the petition[,] the Verification, the Affidavit[,] the Sworn Detailed Descriptive List of Assets and Liabilities," and "it appearing that there is no necessity of any administration of this succession," the Judgment of Possession

---

[61] *Id.*
[62] *Id.*

issued, "sen[ding Sarah] into possession of all of the property comprising the estate of the decedent" including 150 Chalmale Drive and 1513 St. Tammany Ave.[63] The property at 1101 West Hall Avenue is not referenced.

Nearly three months later on January 11, 2024, Sarah through counsel filed a motion in the succession proceeding requesting that the state court "issue five (5) certified letters testamentary" so that she is empowered "to collect all property of [her father], and to perform all other lawful acts as executor[.]"[64] But the state court denied Sarah's motion, writing "DENIED – Judgment of Possession already granted and signed."[65]

*Procedural History*

Just weeks before Bob died, Sarah sued Victoria invoking this Court's diversity jurisdiction.[66] She alleged that she "currently possesses power of attorney that allows her to take action on behalf of her father . . . and to conduct his affairs."[67] Sarah and Sam (before his death) allegedly were granted "general power of attorney" to make sure Bob's bills got paid, his medical needs were met, and that he was not exploited because Bob "is unable to handle many of his own affairs and suffers from critical

---

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] ECF No. 1, ECF No. 2. On the day Sarah filed suit, she filed two complaints into the record, both labeled "Complaint." The complaints appear identical except the second complaint, ECF No. 2, merely removed "et al." from next to Victoria's name in the caption—making clear Sarah intended to sue Victoria only. Even though ECF No. 2 was technically an amended complaint, for simplicity's sake, we refer to these two complaints here as the "originating complaints."

[67] ECF No. 2 ¶ 6.

health issues."[68] In these earlier originating complaints, Sarah alleged much of the same as her current allegations:

> The plan to steal the home and take over Bob's affairs, culminated on July 26, 2022, the day before Sam's funeral. Rather than helping Sam's family prepare for his funeral, these sick and vile individuals decided to steal from Sam's father (and his sister). They did this when Victoria and her co-conspirators pressured and tricked Bob into signing a series of documents that transferred the house to Victoria via a purported donation *inter vivos* document.[69]

"Bob could not read or understand the documents due to his duress, poor vision, and various well documented health reasons. Victoria knew this and may even signed Bob's name 'for him' . . . thinking it was allowed by the newly executed power of attorney that she and her cohorts had Bob executed as he prepared to lay his only son to rest."[70] Sarah suggested that she had sued Victoria "to find out who helped orchestrate this act of theft, fraud, elder abuse, and financial exploitation."

When Victoria moved to dismiss the originating complaints, on September 18, 2023, another section of this Court granted the motion in part (as to the fraud, nullity of donation, and intentional infliction of emotional distress claims, insofar as Sarah failed to allege facts indicating that she had the requisite procedural capacity to state a viable cause of action and insufficiently alleged fraud, intentional infliction of emotional distress, and civil conspiracy) and denied the motion in part (insofar as

---

[68] *Id.* ¶ 8.

[69] *Id.* ¶ 20.

[70] *Id.* ¶ 21 and n.3 ("Sarah was informed, the day after her brother's funeral (July 28, 2023) that her power of attorney had been revoked in writing. It is suspected that a new power of attorney was executed revoking Sarah's rights to manage her father's affairs and likely putting Victoria in charge of his affairs.").

Victoria moved to dismiss for lack of subject matter jurisdiction).[71] In so ruling, the Court ordered dismissal of the unjust enrichment and civil conspiracy claims with prejudice but dismissal of the fraud, nullity, and intentional infliction of emotional distress claims without prejudice and accordingly ordered that Sollberger "move to amend her complaint to properly allege the party's ability to bring suit in light of recent developments since the suit was filed, the proper procedural ability to bring suit, and to properly allege the fraud claim under the Federal Rules of Civil Procedure."[72]

On October 3, 2023, Sarah filed a first amended complaint, in which she realleges the four causes of action dismissed without prejudice,[73] which Victoria also moved to dismiss challenging (again) Sarah's procedural capacity and standing.[74] While briefing was underway on that motion, this case was transferred to this section of Court.[75] Three weeks after Victoria filed her reply, Sarah filed a motion for leave to amend her complaint again; the motion was referred to the magistrate judge, who granted in part and denied in part the motion.[76] The resulting second amended complaint is the operative complaint.[77]

On January 19, 2024—after Bob died, after Sarah had requested but before she was denied letters testamentary from the state court, and while Sarah's instant

---

[71] ECF No. 18.
[72] *Id.*
[73] ECF No. 19.
[74] ECF No. 20.
[75] ECF No. 22.
[76] ECF No. 35.
[77] ECF No. 37.

lawsuit was pending—Sarah alleges that her attorney notified her that a document examiner opined that Bob's signature had been forged on the donation *inter vivos*.[78] This newfound forgery allegedly has "forced" Sarah to add as defendants "the four people that vouched for the authenticity of the forged" donation *inter vivos*.[79] "It sure smells like someone at Pelican Title, LLC was in on the fraud," Sarah alleges, "[or a]t the very least, Pelican Title LLC was negligent in their practices and procedures that enabled such a fraud to occur under their roof."[80] Sarah also alleges that "[p]ursuant to [Bob's] last will and testament, Sarah was bequeathed all her father's assets, including the home at 1101 West Hall Avenue in Slidell, Louisiana."[81] Bob's will is not filed into this Court's record with her second amended complaint.

The second amended complaint names additional defendants and adds a conversion cause of action.[82] Against each of the five defendants, Sarah advances five causes of action: (1) nullity of donation *inter vivos* due to fraud; (2) nullity of donation *inter vivos* due to undue influence; (3) nullity of donation *inter vivos* due to improper form; (4) intentional infliction of emotional distress through elder abuse; and (5) conversion. In addition to (presumably, a declaration[83] of) nullity, Sarah also seeks the following remedies: damages necessary to restore the property, as well as for lost

---

[78] *Id.* ¶ 36.

[79] *Id.* ¶ 37.

[80] *Id.*

[81] *Id.* ¶ 1.

[82] ECF No. 37.

[83] In seeking to "revoke" the donation, though Sarah ostensibly seeks declaratory judgments nullifying the donation *inter vivos*, she nowhere invokes the Declaratory Judgment Act or expressly states that she seeks a declaratory remedy.

use, emotional distress, and for the time and expense associated with uncovering the fraud; attorney's fees; and costs.

## II.   LEGAL STANDARDS

"Federal courts are courts of limited jurisdiction; without jurisdiction conferred by statute, they lack the power to adjudicate claims." *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (citation omitted). "Rule 12(b)(1) motions challenge the subject matter jurisdiction of the district court." *McLin v. Twenty-First Jud. Dist.*, 79 F.4th 411, 415 (5th Cir. 2023). "[A] claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 668 F.3d at 286 (citation omitted) (quotation omitted). Courts are to consider a Rule 12(b)(1) jurisdictional argument before addressing any other arguments on the merits. *Id.* (citing *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)). Even in the absence of a Rule 12(b)(1) motion, *sua sponte* dismissal is mandatory when the Court determines that it lacks subject-matter jurisdiction. *See Carver v. Atwood*, 18 F.4th 494, 497 (5th Cir. 2021) (citing Fed. R. Civ. P. 12(h)(3)) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1869) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

When a defendant brings a Rule 12(b)(1) motion, or when jurisdiction is examined *sua sponte*, "the plaintiff bears the burden of proof in establishing that jurisdiction does in fact exist." *See Porretto v. City of Galveston Park Bd. of Trs.*, 113 F.4th 469, 481 (5th Cir. 2024). To carry her burden at the pleading stage, the plaintiff generally must "allege a plausible set of facts establishing jurisdiction." *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 652 (5th Cir. 2012). Where the jurisdictional question is confined to the pleadings, "[a]ll well-pleaded facts are accepted as true and viewed in the light most favorable to the plaintiff." *Shemwell v. City of McKinney*, 63 F.4th 480, 483 (5th Cir. 2023) (internal quotations and citations omitted). However, in examining its jurisdiction, the Court may go beyond the pleadings to find a plausible set of facts to support subject matter jurisdiction by considering any of the following: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *See Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996).[84]

---

[84] In resolving a Rule 12(b)(6) motion to dismiss testing the sufficiency of the complaint, the Court is generally "limited to the contents of the pleadings, including any attachments thereto." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (citation omitted). However, there are two limited exceptions to this general rule in which the Court may rely on evidence beyond the complaint without converting a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. *George v. SI Grp., Inc.*, 36 F.4th 611, 619 (5th Cir. 2022) (citing *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2014)). First, the Court "may consider 'any documents attached to the motion to dismiss that are central to the claim and referenced [or incorporated] in the complaint.'" *See PHI Grp., Inc. v. Zurich Am. Ins. Co.*, 58 F.4th 838, 841 (5th Cir. 2023) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)); *see also Doe v. Ferguson*, 128 F.4th 727, 733-34 (5th Cir. 2025) (citation omitted); *Edmiston v. Borrego*, 75 F.4th 551, 557-58 (5th Cir. 2023) (citations omitted). Second, the Court—without converting a Rule 12(b)(6) motion into one for summary judgment—may consider "a matter subject to judicial notice under Federal Rule of Evidence 201." *George*, 36 F.4th at 619. Because Plaintiff has objected to consideration of matters outside her complaint in resolving the pending motions, the Court notes these rules of the road for

If a court lacks subject matter jurisdiction over an action or claim, the action or claim is properly dismissed without prejudice. *See Spivey v. Chitimacha Tribe of La.*, 79 F.4th 444, 449 (5th Cir. 2023) ("[I]t's precisely because the jurisdiction-less court cannot reach the merits that it also cannot issue with-prejudice dismissals that would carry *res judicata* effect. So we've repeatedly insisted that a jurisdictional dismissal *must be without* prejudice to refiling in a forum of competent jurisdiction.") (quotation omitted; emphasis in original). Because dismissal for lack of jurisdiction is mandatory and without prejudice, "[w]hen a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.*" See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citations omitted); *see also In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 668 F.3d at 287 (prioritizing jurisdictional inquiries "prevents a court without jurisdiction from prematurely dismissing a case with prejudice").

## *Justiciability*

As for constitutional limits on federal jurisdiction, Article III of the Constitution extends "[t]he judicial Power," only to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "[I]f a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *Murthy*

---

Rule 12(b)(6) motions and does so additionally in the event that the jurisdictional briefing ordered treads into matters properly considered on a Rule 12(b)(6) motion.

*v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).

Justiciability doctrines such as standing, ripeness, and mootness implement this constitutional limit on federal jurisdiction and ensure that federal courts do not render advisory opinions on abstract disputes. For example, "a case or controversy can exist only if a plaintiff has standing to sue." *United States v. Texas*, 599 U.S. 670, 675 (2023). "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021) (citation omitted). To establish standing to sue, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citations omitted). "[S]tanding is not dispensed in gross" so "'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy*, 603 U.S. at 61 (quoting *TransUnion LLC*, 594 U.S. at 431).

### *Jurisdiction Versus Capacity and Real-Party-in-Interest*

To be sure, however, Article III standing is a doctrine of jurisdictional significance wholly distinct from real party in interest and capacity concepts, which go to the merits. *See generally Abraugh v. Altimus*, 26 F.4th 298, 302-05 (5th Cir. 2022). Intermingling or conflating these concepts invites confusion and potential legal

20

error. *See Norris v. Causey*, 869 F.3d 360, 366-67 (5th Cir. 2017). So the parties and the Court must beware of "cross labeling." *Id.* at 366.

The Fifth Circuit and Supreme Court have cautioned that "imprecision can lead to legal error" so courts must be "meticulous" when analyzing the different conceptions of standing, constitutional versus prudential. *See Abraugh*, 26 F.4th at 301 (finding that the district court erred when it held that it lacked subject matter jurisdiction; instead, the plaintiff merely lacked prudential standing—because Louisiana law did not authorize her to bring a particular cause of action—but the plaintiff had Article III standing—a constitutionally cognizable interest in the life of her son).

Pertinent to the facts alleged in the instant case, where a Louisiana state-court judgment of possession placed a plaintiff in possession of particular property but was silent as to the property which was the object of federal litigation, another section of this Court granted a defendant's Rule 12(b)(1) motion to dismiss for lack of standing, holding that the plaintiff lacked Article III standing to sue in her individual capacity, finding instead that she "may bring claims on behalf of the estate" against the defendants. *See Okpalobi v. American Nat'l Prop. & Cas. Co.*, No. 23-6691, 2024 WL 2050600, at *7 (E.D. La. May 8, 2024) (Brown, J.) (turning to address whether the plaintiff on behalf of the estate had sufficiently pled claims under Rule 12(b)(6)); *see also Okpalobi v. American Nat'l Prop. & Cas. Co.*, No. 25-809, 2025 WL 3122828, at *6 (E.D. La. Feb. 28, 2024) (Brown, J.) (noting prior holding that plaintiff lacked standing to sue in her individual capacity but "again find[ing]" that plaintiff had

standing to sue on behalf of the estate because the state court in the succession proceeding recognized the plaintiff as the executrix of the decedent's estate).

In the Louisiana donation *inter vivos* context, it appears that the donor (if living) or the executor of the deceased donor's estate typically is the party seeking to nullify or revoke a donation *inter vivos. See, e.g., Fandal v. Quinlan*, No. 21-552, 2022 WL 1284555, at *1, 2 (E.D. La. Apr. 29, 2022) (Vitter, C.J.) (observing that, after plaintiff who initiated lawsuit seeking to set aside a donation *inter vivos* of her immovable property died, the executor of the deceased plaintiff's estate "was ultimately named as the substitute plaintiff" and the Court permitted substitution in his capacity as executor); *see also, e.g., Succession of Dopp*, 2021-0193 (La. App. 1 Cir. 10/18/21), 331 So. 3d 949 (affirming determination by trial court in succession proceeding which declared Act of Donation *inter vivos* null and invalid); *cf. Impson for Impson v. Succession of Impson*, 2018 WL 1751638, 2017-1133 (La. App. 1 Cir. 2/21/18) (unpublished) (action to nullify act of donation *inter vivos* instituted first against decedent's (donee's) unopened succession and then pursued by administrator of donor's succession following donor's death); *cf. Elias v. Newman*, No. 104CV663, 2007 WL 1611874 (S.D. Miss. May 30, 2007) (applying Louisiana law and observing that conservator of incapacitated donor's estate was authorized to file lawsuit on behalf of conservatorship to attempt to recover donations *inter vivos*). At most, such cases illustrate the principle that, in an ordinary case, the donor or executor of the donor is the party with standing or the real party in interest (or both).[85]

---

[85] Notably, no standing objections were lodged in these cases. Where cases neither note nor discuss standing or jurisdiction, those cases cannot be invoked as precedent on standing or jurisdiction.

The distinction between Article III standing on the one hand and defects in capacity and/or real party in interest on the other has another important implication pertinent to the instant case: generally, only defects in capacity or real party in interest may be corrected as a matter of course by amendment. For example, where a plaintiff filed a lawsuit to set aside a donation *inter vivos* in another section of this Court, the Court permitted the unopposed substitution of the plaintiff's estate's executor as plaintiff when the individual donor-plaintiff died during the lawsuit. *See Fandal*, No. 21-552, 2022 WL 1284555, at *2. State law informs real party in interest and capacity issues. *See, e.g., Abraugh,* 26 F.4th at 303-04 (observing that prudential standing presents a merits question concerning who under the governing state law is the real party in interest); *see also* 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1543 (3d ed. 2025) (Rule 17 mandates "that the action must be brought by the person who, according to the governing substantive law, is entitled to enforce the right"); *see also cf. In re Succession of Griggs*, 2011-0172 (La. App. 3 Cir. 12/21/11), 83 So.3d 86, 89 (where "conflicts exist" in succession proceeding, "the proper approach to address the conflicting claims is by placing the succession under administration . . . using the duly qualified succession representative appointed by the court as the proper plaintiff to enforce any right the succession may have against" an adversary). Regardless, a real party in interest challenge, as "an affirmative defense that must be asserted with reasonable

---

*See Wilkins v. United States*, 598 U.S. 152, 160-61 (2023) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 511 (2006) ("drive-by jurisdictional rulin[gs]" have "no precedential effect"); *see also Abraugh*, 26 F.4th at 305 (citation omitted) (same).

promptness[,]" may be waived or forfeited. *See Norris*, 869 F.3d at 367; *see also* Fed. R. Civ. P. 17(a)(3).[86]

Though issues of capacity and real party in interest do not intrinsically present jurisdictional questions, they may bear on diversity jurisdiction. *See, e.g., see also* 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1556 (3d ed. 2025) (articulating the "general rule . . . that the citizenship of the real party in interest is determinative in deciding whether diversity jurisdiction exists" and noting that "[t]he citizenship rule testing diversity in terms of the real party in interest is grounded in notions of federalism"); *see also* 28 U.S.C. § 1332(c)(2) (for the purposes of diversity jurisdiction, "the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent"); *see also* Fed. R. Civ. P. 17(a)(1) (stating that "[a]n action must be prosecuted in the name of the real party in interest" and providing that an "executor" or "administrator" may sue in their own names without joining the person whose benefit the action is brought).

Rule 17(a)(3) permits timely joinder or substitution of the real party in interest under certain circumstances. Conversely, insofar as a plaintiff may seek to add or substitute a party plaintiff in order to cure a *jurisdictional* defect, the Fifth Circuit has indicated doing so is prohibited because jurisdiction is assessed at the time the

---

[86] Arguments in favor of jurisdiction may also be waived. *See Abraugh*, 26 F.4th at 305 (citations omitted) (observing that federal courts are constitutionally obliged to decline jurisdiction where it does not exist—whether the parties raise the issue or not—but federal courts "have [no] duty to accept subject matter jurisdiction based on theories not actually presented by the parties"; that is, "arguments in favor of jurisdiction[ ] can be forfeited or waived").

lawsuit is filed. *See Hernandez v. Smith*, 793 F. App'x 261, 265-66 (5th Cir. 2019) (citations omitted); *cf. Pluet v. Frasier*, 355 F.3d 381, 384-86 (5th Cir. 2004). *But see generally Fund Liquidation Holdings LLC v. Bank of America Corp.*, 991 F.3d 370, 384-87 (2d Cir. 2021) (determining that Article III standing was satisfied including "because 'the concerns animating [Article III standing are absent]' where a real party in interest exists and is willing to join an action"). Given the conflation that sometimes results from confusing the distinct constitutional doctrine of standing with the concepts of real party in interest and capacity, care must be taken to address each concept individually.

*Diversity Jurisdiction*

As for the specific statutory grant (and limit) on federal jurisdiction applicable to this case, under 28 U.S.C. § 1332, "[d]iversity jurisdiction is proper only if [the amount in controversy exceeds $75,000 and] there is complete diversity of citizenship among the parties." *Megalomedia Inc. v. Philadelphia Indem. Ins. Co.*, 115 F.4th 657, 659 (5th Cir. 2024) (citation omitted). "This means '[e]ach plaintiff must be diverse from each defendant[,]'" *id.* (quotation omitted), or that "all persons on one side of the controversy [must] be citizens of different states than all persons on the other side." *McLaughlin v. Miss. Power Co.*, 376 F.3d 344, 353 (5th Cir. 2004) (*per curiam*). Because "the citizenship of an LLC is determined by the citizenship of its members," alleging where LLCs do business or have their principal place of business are irrelevant to diversity jurisdiction. *See Megalomedian, Inc.*, 115 F.4th at 659 (citation omitted). Parties may not stipulate to subject matter jurisdiction. *Id.*

*The Probate Exception*

Even if the complete diversity and amount in controversy requirements of diversity jurisdiction are met, a narrow judicially-created substantive limit on federal diversity jurisdiction may be implicated where federal litigation interferes with state probate proceedings. The probate exception precludes federal court interference with matters reserved to state probate courts. *See Marshall v. Marshall*, 547 U.S. 293, 311 (2006). "A federal court action interferes with probate proceedings when it 'challenge[s] the validity of [the] probate proceeding, . . . seek[s] to recover property from [the]estate,' or when it requires the federal court to 'assume control of estate property.'" *See Whitmore v. Johnson*, No. 18-2788, 2018 WL 5772461, at *2 (E.D. La. Nov. 2, 2018) (Vance, J.) (quoting *Breaux v. Dilsaver*, 254 F.3d 533, 537 (5th Cir. 2001)). Context is critical to determining whether or the degree to which disposition of claims in federal court may interfere with state probate proceedings.

*The Rooker-Feldman Doctrine*

Where state courts have rendered final decisions on issues later presented for federal court review, yet another narrow bar to federal jurisdiction may be implicated. The *Rooker-Feldman* doctrine "generally precludes lower federal courts 'from exercising appellate jurisdiction over final state-court judgments.'" *Miller v. Dunn*, 35 F.4th 1007, 1010-12 (5th Cir. 2022) (citation omitted). Accordingly, insofar as a plaintiff effectively seeks to collaterally challenge a *final* state court judgment, a federal court would have no authority to sit in review of such decision.

### III.    SUBJECT MATTER JURISDICTION ISSUES TO BE BRIEFED

"[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002). This Court thus has "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh*, 546 U.S. at 514 (citation omitted). If the Court "concludes that it lacks subject-matter jurisdiction, [it] must dismiss the complaint in its entirety." *Id.*

Since the institution of this lawsuit, Plaintiff's father has died, and Plaintiff has amended her complaint in response to an order issued by another section of this Court. In the operative complaint, Sarah sues on her own behalf and alleges that she is "the sole heir to the estate of her deceased father[, and] the administrator of his estate[.]"[87] Essentially, though it is not entirely clear, Plaintiff alleges that she is entitled to the Slidell property where Victoria lives because Sarah is the sole heir to her father's estate, the succession for which is (or was) pending in Louisiana state court. Defendants move to dismiss Plaintiff's claims for failure to state a claim and, alternatively, for lack of subject matter jurisdiction (specifically, lack of Article III standing). But the Court may not reach the merits of the Defendants' Rule 12(b)(6) motions to dismiss Plaintiff's claims until jurisdiction is properly alleged and determined. Several defects are apparent and have not been briefed. The parties will

---

[87] ECF No. 37 ¶ 1.

have the opportunity to brief all issues bearing on this Court's power to hear this case.

### A. Diversity Jurisdiction

Sarah invokes this Court's subject matter jurisdiction under 28 U.S.C. § 1332(a), the federal diversity statute. She alleges that she is a citizen of Mississippi and each Defendant is domiciled in Louisiana. But her allegation as to the citizenship of Defendant Pelican Title, LLC is fatally defective.

"Because federal courts have limited jurisdiction, parties must make 'clear, distinct, and precise affirmative jurisdictional allegations' in their pleadings." *MidCap Media Finance, LLC v. Pathway Data, Inc.*, 929 F.3d 310, 313 (5th Cir. 2019). The party invoking the Court's jurisdiction has the burden to show that the Court in fact has diversity jurisdiction. *See Ticer v. Imperium Ins. Co.*, 20 F.4th 1040, 1045 (5th Cir. 2021).

As set forth above, "[d]iversity jurisdiction is proper only if there is complete diversity of citizenship among the parties." *Megalomedia Inc.,* 115 F.4th at 659 (citation omitted). The Fifth Circuit has "repeatedly held that the citizenship of an LLC is determined by the citizenship of its members." *Id.* "At the pleading stage, the party invoking the federal court's jurisdiction must allege the citizenship of each LLC's members." *Id.* (citation and quotation omitted). "At the summary judgment stage, that party must provide evidence sufficient to support a jury finding of the citizenship of each LLC's members." *Id.* (citation omitted). "And at trial, that party must prove the citizenship of each LLC's members." *Id.* (citation omitted). "The

parties cannot stipulate to diversity jurisdiction, just as they cannot stipulate to any other form of subject matter jurisdiction." *Id.* (citations omitted).

Under some circumstances, where a plaintiff fails to adequately allege a defendant LLC's membership and citizenship, the same may be substantiated on the record, which may render unnecessary the filing of an amended complaint by a plaintiff solely to clarify defective allegations. *See Rx Solutions, Inc. v. Caremark, LLC*, --- F.4th ---, 2026 WL 100806, at *5-6 (5th Cir. Jan. 14, 2026) (where plaintiff failed to adequately allege defendant LLC's membership/citizenship, admission in original answer identifying membership of LLC "supplies a clear basis for diversity jurisdiction" and thus "the record substantiate[d] a basis for diversity jurisdiction").

Here, Plaintiff has failed to affirmatively allege complete diversity. Specifically, she fails to allege the membership of Pelican Title, LLC.[88] Pelican Title's citizenship may only be determined by the citizenship of its *members*. But Plaintiff fails to allege the citizenship of all members, much less identify any member(s). The Court may not simply assume that Defendant Pelican Title, LLC's membership traces back solely to Mr. Moran, the alleged "owner of Pelican Title, LLC", such that Pelican Title shares Mr. Moran's Louisiana citizenship. Nor has Pelican Title, LLC (or any party to this lawsuit) filed the mandatory Rule 7.1 disclosure statement naming and identifying the citizenship of every individual or entity whose citizenship is attributed

---

[88] ECF No. 37 2 (alleging that "Defendant PELICAN TITLE, LLC is a Louisiana Limited Liability Company registered and domiciled in Louisiana [and] amenable to service of process through their registered agent, Kenneth S. Moran[.]"). Plaintiff does not allege "citizenship" for the other individual parties; however, she does allege "domicile" and not just "residence" so such allegations do not appear to be clearly technically deficient. *See MidCap Media Finance, LLC*, 929 F.3d at 313-14.

to that party. *See* Fed. R. Civ. P. 7.1(a) and (b) (mandating that the disclosure statement be filed with "first appearance[ ] or other request addressed to the court").

Jurisdiction cannot be conferred by omission, waiver, or acquiescence. Pelican Title, LLC promptly shall file its Rule 7.1 disclosure statement. On proper motion, if necessary, Plaintiff may be permitted to amend her defective jurisdictional allegations to cure this pleading defect by alleging the citizenship of Pelican Title's members at the time of filing.[89] *See* 28 U.S.C. § 1653. The Court is precluded from reaching the merits of Defendant's Rule 12(b)(6) motions until Plaintiff alleges, or the parties establish, complete diversity of *citizenship*.

Additionally, the nature of Plaintiff's claims begs other jurisdictional questions which must be briefed by the parties.

## B. The Probate Exception to Diversity Jurisdiction

The nature of Plaintiff's "nullity" claims begs the jurisdictional question whether such claims fall within the scope of the probate exception to federal diversity jurisdiction. Neither party mentions this issue so the Court orders briefing.

In her first three causes of action, Sarah seeks to nullify (or seeks declarations of nullity as to) the donation *inter vivos* (donating the property to Victoria) presumably so that Sarah may ultimately succeed to the ownership of the 1101 West Hall Avenue property after it is administered through her father's succession. Neither she nor the Defendants have briefed whether, and if so how, any such declaration will impact the administration of the *Succession of Robert Sollberger*.

---

[89] Only if all jurisdictional issues are resolved in favor of Plaintiff would the Court entertain a motion seeking leave to amend the complaint to correct defective jurisdictional allegations.

Defendants contend that Sarah's failure to include 1101 West Hall Avenue in the sworn descriptive list filed in the succession proceeding estops her from litigating entitlement to that property here. But they fail to cite any cases on point and arguments sounding in estoppel or preclusion seem more appropriately advanced as a defense to the merits of Sarah's lawsuit. No party addresses the jurisdictional implications of the remedies Sarah pursues here.

In this federal litigation, Sarah alleges that she is the sole heir to the property in her father's succession and that Victoria lives in and is in possession of the property rightfully owned outright by her father before his death. For their part, Defendants submit the state-court record from the *Succession of Robert Sollberger* and suggest that filings therein preclude Sarah's lawsuit here.[90] No party grapples with the scope of the probate exception to federal diversity jurisdiction and whether the Court may render declarations regarding immovable property, which—if Plaintiff succeeds— ostensibly should or would be in possession of the succession proceeding and administered/probated therein.

Federal courts may not interfere with state probate proceedings; the probate exception thus functions "to proscribe 'disturb[ing] or affect[ing] the possession of property in the custody of a state court.'" *See Marshall*, 547 U.S. at 311. However, federal courts may exercise jurisdiction over claims that are merely related to such a proceeding. *See Curtis v. Brunsting*, 704 F.3d 406, 408 (5th Cir. 2013) (citation omitted). Determining whether the narrow probate exception is implicated thus

---

[90] Again, preclusion or estoppel principles are generally lodged as defenses and do not feature in jurisdictional inquiries.

becomes a line-drawing exercise dependent on procedural posture, claims alleged, and state succession law. *See McCleery v. Speed*, 516 F. Supp. 3d 592, 596-99 (W.D. La. 2021) (Joseph, J.) (observing that Louisiana state law compelled a determination that the assets allegedly in the possession of the defendant-heirs were within the "legal custody" of the succession proceeding, and concluding that the probate exception to diversity jurisdiction applied to plaintiff-executrix's claims against the decedent's children such that particular claims concerning estate property must be dismissed without prejudice).

Where a federal case like this one at least facially concerns matters related to a state succession proceeding, the Court is obliged to determine whether the remedies Plaintiff seeks would impact the property comprising the succession proceeding such that the probate exception to diversity jurisdiction applies. The parties must brief whether this case falls inside the scope of the probate exception to federal diversity jurisdiction such that Plaintiff's claims must be dismissed without prejudice to re-filing these claims in state court.

Before the Court may reach the merits of Defendants' Rule 12(b)(6) arguments, the Court must determine that its disposition of the merits of Plaintiff's claims will not interfere with the administration of the *Succession of Robert Sollberger*. Accordingly, the parties shall brief the scope of the probate exception, the status and scope of the underlying succession proceeding, applicable state succession law, and whether any of Plaintiff's claims fall within the exception's scope such that those claims must be dismissed without prejudice for lack of subject matter jurisdiction.

Two additional independent jurisdictional issues loom: standing and the *Rooker-Feldman* doctrine.

### C. Article III Standing and Jurisdictional Implications of Real Party In Interest Considerations

In the alternative to their Rule 12(b)(6) arguments, Defendants purport to challenge Plaintiff's Article III standing. However, Defendants fail to adequately brief the issue: they pay lip service to the familiar *Lujan* test but identify no case on point and fail to analyze the standing requirements in the context of Plaintiff's specific claims.[91] For her part, Plaintiff, as the party invoking this Court's jurisdiction, bears the burden of establishing this Court's jurisdiction but simply concludes without discussion that Defendant's standing arguments are wrong. All parties are ordered to brief whether Plaintiff has Article III standing in her individual capacity as well as whether Plaintiff, as the administrator of her father's succession, is the real party in interest for any of the asserted claims, considering the potential jurisdiction-divesting implications of the latter.

In evaluating its own jurisdiction, there can be no debate that the Court may consider Defendants' submission of the state succession proceeding record.

---

[91] For example, Victoria argues that "[s]tanding is not provided by the statement that Plaintiff is the sole heir of her father's property" because "Robert Sollberger died knowing his grandson lived nearby at 1101 W. Hall Avenue, and the reasonable inference would be that Mr. Sollberger would want his grandson to be an heir to his estate." ECF No. 46-1 at 13-14. Whether this is an Article III standing or real party in interest challenge, or some veiled forced heir contention better suited to the succession proceeding, the argument advanced is not developed and thus not clear. Victoria's other arguments regarding Plaintiff's alleged lack of procedural capacity and/or real party in interest are likewise murky and she fails to offer authority for how this alleged lack of procedural capacity bears on Article III standing analysis (or, more broadly, the Court's subject matter jurisdiction). Though she urges "dismissal with prejudice for lack of standing," *see id.* at 16, that is incorrect insofar as she seeks dismissal for lack of Article III standing: dismissal without prejudice is the appropriate disposition when the Court dismisses a claim due to lack of subject matter jurisdiction.

Defendants contend that Sarah instituted succession proceedings in state court and ultimately obtained a judgment of possession after the sworn Detailed Descriptive List of Assets and Liabilities—which did *not* mention 1101 W. Hall Avenue—was filed in the succession proceeding as an asset comprising Bob's estate. But none of the parties adequately address the jurisdictional implications of the succession proceeding or the filings therein.

That "the succession representative . . . is the proper plaintiff to sue to enforce a right of the deceased or his succession[,]" La. C.C.P. art. 685, has jurisdictional implications here, where Plaintiff purports to invoke this Court's subject matter jurisdiction based on the diversity statute, 28 U.S.C. § 1332(a). That statute clearly provides that "the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent[.]" *Id.* § 1332(c)(2).

Sarah alleges that Bob was a citizen of Louisiana just like each of the Defendants. The legal representative of Bob's succession (purportedly, Sarah in her capacity as the administrator or executrix of Bob's succession) has never appeared as a party to this litigation. Yet, both Plaintiff and Defendants at times indicate that perhaps the succession administrator is the plaintiff with standing and/or the real party in interest to pursue some or all of the claims advanced in this litigation. To be sure, "the succession representative . . . is the proper plaintiff to sue to enforce a right of the deceased or of his succession, while the latter is under administration." La. C.C.P. art. 685. If, for example, Plaintiff purports to allege that the Act of Donation *Inter Vivos* "was null and of no effect[ such that] the property was never divested from

34

the decedent's estate," then the succession representative appears to be the party interested in making that particular claim. *See Richard's Estate v. Richard*, 321 So. 2d 375, 376 (La. App. 3 Cir. 10/8/75). Given the potential jurisdictional implications of these issues, they must be fully briefed.

That is, the parties shall brief which if any of Sarah's claims on her own behalf should be dismissed without prejudice for lack of subject matter jurisdiction and/or whether the administrator of Bob's succession is the proper party plaintiff for any such claims. The parties allude to these issues but do not satisfactorily brief the jurisdictional implications they present. For example, Sarah contends that "The *Succession of Robert Sollberger* is still open and if *it* gains an ownership interest in the property through this litigation, the appropriate pleadings will be filed." *See, e.g.,* ECF No. 53 at 6 (emphasis added); *see also* ECF No. 51 at 4 ("Not only is she not a nominal representative, but she is the only person on earth who can represent the interests of her Father's succession and is rightfully before this Court attempting to do so."); *see also id.* at 5 (invoking Article 685 and arguing that "if no succession is open and under administration, an heir can sue directly"); *see also id.* at 12 (arguing that Sarah "is the Administrator of [Bob's] succession"); *see also* ECF No. 53 at 16 (same).[92] But what happens when an heir and executrix waives administration, is placed in possession of all the estate's property but excluded from the (ostensibly final) judgment of possession is a property which the heir now personally seeks to

---

[92] Where, as here, the Court is considering its own subject matter jurisdiction, Plaintiff's concerns that matters outside the pleadings may not be considered are unfounded. In addition to state succession law, the actual succession proceeding for Bob Sollberger is directly relevant to resolving the potential jurisdictional issues that ostensibly plague this federal case.

recover in federal court, for which the state succession court denied letters testamentary? Must she reopen the succession so that the ownership of the property she alleges is or should be part of the estate may be administered therein?

The parties may not overlook basic succession law and procedure, which is critical to determining whether (or the extent to which) Sarah seeks to enforce a right of hers, her father, and/or of his succession. If the law arguably indicates that the administrator of Bob's succession is the real party in interest to pursue the claims in this litigation, then the parties must demonstrate how complete diversity is not destroyed. In briefing these issues, the parties must cite binding and analogous authorities in support of their respective positions on justiciability and real party in interest, which necessarily must include briefing on the context from which this case cannot be divorced, Louisiana succession law.

### D. The *Rooker-Feldman* Doctrine

Finally, the parties allude to other state court proceedings. Both parties reference the *Succession of Robert Hampton Sollberger*, in which the state court ostensibly issued a judgment of possession and then denied Sarah's motion seeking letters testamentary. Defendants allude to a criminal proceeding, as well as at least one prior civil proceeding, *Humphries v. Stahler*, No. 2022-13492, in which the state court allegedly enjoined Sarah and her mother from interfering with Victoria's ownership and use of the property.[93] Scant details are provided. Still the Court must

---

[93] *See* ECF 46-1 at 3, 5. Plaintiff alludes to conduct stopping short of criminal or civil proceedings. *See* ECF No. 37 ¶ 32 (alleging that "Sarah filed an elder abuse report"; "Victoria filed police reports alleging battery by Sarah's mother"; "[Victoria] sought TROs alleging Sarah's mother was a menace to society").

assure itself of its jurisdiction. Accordingly, insofar as any of Plaintiff's claims in the instant lawsuit is tantamount to a collateral attack on a final state-court judgment, the parties must brief whether the *Rooker-Feldman* doctrine applies to defeat this Court's subject matter jurisdiction. *See Miller*, 35 F.4th at 1010.

## IV.   CONCLUSION

As a threshold matter, Plaintiff fails to affirmatively and distinctly allege that the Court has diversity jurisdiction. Before she seeks leave to amend the defective jurisdictional allegations, however, the parties must address other potential jurisdictional defects, which may not be amendable.[94] Accordingly,

**IT IS ORDERED** that parties shall show cause why this case or any claims asserted in this litigation should not be dismissed without prejudice for lack of subject matter jurisdiction. The parties shall file briefing broadly addressing the Court's subject matter jurisdiction including the specific issues addressed in this Order (*i.e.,* whether this Court has diversity jurisdiction and/or whether the probate exception applies; whether Sarah's claims are justiciable, including but not limited to whether she has Article III standing to pursue each claim against each defendant; whether Sarah, as the administrator of her father's succession, is the (or a) real party in interest, and, if so, the jurisdictional implications of this; whether the *Rooker-Feldman* doctrine applies, as follows:

---

[94] Of course, if any member of Pelican Title, LLC shares Mississippi citizenship with Plaintiff, the parties shall promptly so advise by moving to dismiss for lack of diversity jurisdiction or otherwise address this issue in their forthcoming jurisdictional briefing.

37

- No later than **February 20, 2026**, Plaintiff and Defendants, respectively, shall file their initial memoranda bearing on the Court's subject matter jurisdiction.

- No later than **March 6, 2026**, Plaintiff shall file a response to Defendants' initial memoranda and Defendants shall file response(s) to Plaintiff's initial memorandum.

**IT IS FURTHER ORDERED** that the Defendants' motions[95] to dismiss Plaintiff's second amended complaint are **DISMISSED WITHOUT PREJUDICE**.

New Orleans, Louisiana, this 2nd day of February, 2026.

BRANDON S. LONG
UNITED STATES DISTRICT JUDGE

---

[95] ECF Nos. 46, 49, and 50. In Victoria's more recent motion to dismiss (ECF No. 46), she indicates that she "supplements" her previous motion to dismiss (ECF No. 20). The Court has deemed incorporated by reference arguments asserted in Victoria's motion to dismiss Plaintiff's first amended complaint (ECF No. 20) to the extent they are not addressed in the latest motion (ECF No. 46). Regardless, all pending motions are dismissed without prejudice to being re-urged following jurisdictional briefing, the Court's determination as to its subject matter jurisdiction, and/or the filing of an amended complaint.

38